[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the Estate of Walter Langer, the fiduciaries of said Estate (Leona Robinson and John Paul Reiner), and Evyan Perfumes, Inc. from the Statement of Compensation and the Certificate of Taking filed by the Town of Westport for a portion of a certain tract of real property owned by the plaintiffs. The "taking date" was January 26, 1988. The list of plaintiffs shows the "Estate of Walter Langer, d/b/a Evyan Perfumes."
Prior to the taking the plaintiffs owned 32.01 acres of land with frontage in excess of 300 feet on Post Road East in Westport, Connecticut, at the intersection of Compo Road North. The portion taken consists of approximately 29.495 acres. Of this portion all but 1.71 acres is in a Residence A zone, the 1.71 acres being in a Commercial Zone (General Business District), the Post Road East frontage to a depth of 200 feet. The partial taking left plaintiffs with 2.515 acres of residential property containing a single residential dwelling with access from Evergreen Avenue shown on Plaintiffs' Exhibit A.
The Statement of Compensation and Certificate of Taking discloses that the town of Westport deposited with the Clerk of the Superior Court $8,375,000 as damages for the acquisition of the 29.495 acres, which the plaintiffs have received from the Clerk. Plaintiffs allege this sum is inadequate and seek the CT Page 4309 court's determination of damages.
 II
In an appeal such as this the burden of proof rests upon the plaintiffs to establish the inadequacy of $8,375,000 as proper damages for the taking. The court therefore begins by a brief analysis of the plaintiffs' evidence in support of their claim. Plaintiffs offered a licensed surveyor and a licensed engineer who claimed that 47 lots, one-half acre in size, could be created on the taken residential property that would probably comply with Westport zoning requirements. Schematic layouts were prepared and offered in evidence when it appeared from depositions that the defendant would challenge the number of lots the could be achieved. All of these engineering drawings and topographic analyses were prepared for the first time for the trial of this case. Prior to the taking, plaintiffs had done nothing to subdivide their property but instead left it to remain, as it had for years before, as "a substantially undeveloped tract of land" (Plaintiffs' Exhibit K, p. 18). Plaintiffs refer to the tract as "park like" and "breath taking" but of course these characteristics, even assuming the court accepts them as totally accurate (which is questionable as to being "breath taking"), still it only describes the property before the taking, not after it has become a subdivision of building lots with houses on it in half-acre lots.
Plaintiffs' appraiser, Glendinning, establishes his valuation of the Residential A zone property (30.30 acres +/-) based on a "feasibility schematic" prepared by Redniss indicating 47 lots, all one-half acre more or less. He assumes a high probability for approval. He concedes, however, that the 1987 Town Plan of Development designates the subject property as "major open space" (Exhibit K, p. 25).
Glendinning then proceeds to his "analysis of the appraisal problem." (Exhibit K, p. 73 ff.) He recognizes that comparable sales adjusted to the subject would be the most accurate, but bulk land sales have variations that affect the degree of comparability, making this method less accurate. He then seeks to use an alternate approach known as the "Development Procedure" which is defined as a procedure for valuing "underdeveloped acreage that involves discounting the cost of development and the probable proceeds from the sale of developed sites." He says
 "This method, in essence, views the subject property from the point of view of a theoretical developer who must consider such essential CT Page 4310 factors as probable lot yield, estimated development costs, probable selling price of lots, estimated time to dispose of lots in the marketplace (absorption time), etc. in judging what he can pay for the land, raw and undeveloped."
He claims this alternate method is "co-equal and supportive of the Direct Market Comparison Method." The court does not agree that the two methods are co-equal.
He then proceeds to consider what he claims to be "comparable sales of bulk land" in Westport, using the unit of comparison the sale price of each "Achieved or Approved Lot." Although Glendinning speaks of "comparable bulk sales of land," he in fact uses the "lot method" approach to evaluate the property. The court does not agree that the "lot method" of valuation is proper in this case as the court will point out later in this memorandum. Nevertheless, it will comment on some of the sale comparisons used by the witness.
 (a) Sale #1, 43 Imperial Ave., had no approvals for a subdivision. Sales price was $1,200,000 with a bank mortgage for the full price (Nov. 1, 1988) 3.139 acres, 1 family residential Salt Box with 2735 S.F. valued at $200,000.
 Glendinning says nothing about the extremely favorable mortgage financing required no cash investment by the buyer and he also fails to explain why a house as large as this one is only worth $200,000. Furthermore, the court does not accept as accurate the adjustments of + 30% in favor of the subject property for location and topography. This is too favorable to the subject property, keeping in mind that there is no subdivision in existence as of the taking date but the court is requested to consider the subject property as though such a subdivision as plaintiffs propose actually existed. Moreover, the smaller size of Sale #1 deserves more favorable consideration and the — 15% allocated should be larger.
The court also notes in passing that in 1988 Glendinning concedes that the real estate market was "flat" as well as the period thereafter (Exhibit K, p. 79). Kennedy, plaintiffs' other appraiser, on the other hand testified the real estate market started flattening out in early 1987.
(b) Sale #2 is only an unconsummated contract, not CT Page 4311 an actual sale, and the contract is not recorded. This is hardly a reliable "comparable sale." The failure to record a deed at the price Glendinning indicates suggests a number of questions with unknown answers.
 Here again Glendinning is trying to compare a hypothetical lot in a hypothetical subdivision of the subject property that is not in existence. The court will comment later on the propriety of such comparison as a matter of law for the purpose of establishing fair market value in a sale of raw land.
 (c) Sale #3. Glendinning made his appraisal between May 18, 1989, and August 21, 1989. This sale occurred on February 26, 1988. Adjustment for topography (10%) does not appear to have been derived by his first hand observation inasmuch as his photographs of Sale #3, obviously taken in 1989, indicate Sale #3 was already built upon. The adjustment for location would appear to be less than + 15% in favor of subject property and a higher minus adjustment for project size appears more accurate.
 The adjustment for "approvals, profit etc" is pure guesswork since the court has no way of ascertaining its accuracy.
 (d) Sale #4. Dated December 31, 1986. The price of $1,500,000 except for $200,000 is covered by the mortgage. The zoning is for 2 acre lots, Residential AAA. 26.6 acres. No approvals.
 If Glendinning concedes that the market was "flat" in 1988 and he estimates 20% appreciation in 1987, the court questions how he obtains a + 22% adjustment for time as of the taking date in January 1988. To be consistent, this adjustment should not exceed + 20%.
 The — 13% Project Size adjustment should be greater. The court knows nothing about the utilities on Sales #4 and cannot justify a + 5% adjustment in favor of the subject property. The minus lot size adjustment is substantially too low.
The significant factor in Glendinning's appraisal is that all of it is based upon a supposititous non-existent subdivision in the instant case in which 46 lots are appraised at $227,000 each for a total of $10,400,000. The court will explain CT Page 4312 hereafter why it cannot accept such a method of evaluation as the most reliable manner of establishing fair market value as of the taking date.
Glendinning's appraisal then delves into what it labels as the "Development Procedure" (Exhibit K, p. 93), incorporating as he claims a "Discounted Sell-Out Technique." He indulges in a whole series of "estimates" as follows:
 (1) Estimate for time delay for approvals from town agencies and the Conn. Department of Transportation for a proposed road cut for requirements associated with engineering, topography, soils, boundary surveys, retention basins, contingencies, etc. — a "minimum of six months." The court thinks a more appropriate minimum, considering the numerous questions raised in the court of the evidence, would be at least one year, keeping in mind among other things, that the Master Plan for Westport adopted in 1987 describes plaintiffs' property as "major open space" and a subdivision of it would be in contradiction of the Master Plan. Redniss (engineer) conceded that his layout map (Exhibit D) is only a "concept plan" that does not consider all of the zoning and planning requirements. No feasibility study had been done. No traffic studies had yet been made. Drainage and detention basins had to be approved. The entire layout would require approvals by the defendant town and the State.
 (2) Estimate of schedule for disposition for absorption into the market, keeping in mind the existence of the Gault subdivision of about 60 lots in proximity to the subject property and the existence of what Glendinning describes as a "market flat in 1988 and thereafter," the court is not aware of where Glendinning obtained his information about the residential lots offered for sale, his description of the majority of them as "marginal", and the "dwindling supply of desirable lots." It cannot, therefore, evaluate his statements for accuracy.
 Continuing his substantial amount of speculation and prognostication of the future, Glendinning asserts the "lots" would be absorbed "quickly", notwithstanding his own concession that the market was "flat in 1988 and thereafter." He then contends that the real estate market "will stabilize" in the second quarter of 1990, (Exhibit K, p. 95), whatever CT Page 4313 that may mean. He does establish a caveat for his prediction, viz."[a]ssuming no unforeseen economic disaster or other calamity." With those additional assumptions he asserts absorption is basically a function of prudently feeding lots into the market at a rate designed to maintain the best possible balance between price and rate of disposition.
 This "prudent rate", he says, would average approximately 2 "lots" per quarter for the first two years, 4 "lots" per quarter "with the estimated stabilization of the real estate market in January 1990," and 5 "lots" per quarter thereafter. The total sell-out would take 3 3/4 years (15 quarters) from date of final subdivision approvals. He estimates the sale of 8 "lots" in the first two quarters after the six month delay he allows for approvals.
 At no time did Glendinning explain what he means by "stabilization" of the real estate market by January, 1990. Since he chose to make these predictions about the future, the court can determine their accuracy by what the situation was at time of trial, some two years later. It can take judicial notice of the very substantial decline in demand for real estate in this area, to some extent evidenced by the horrendous problems facing many banks in Connecticut and Fairfield County by reason of the virtual collapse of the real estate market. Judged by the developments in real estate in the past two years or more, Glendinning's vaticinations do not seem to hold water. The only "stabilization", of the real estate market the court can perceive is a very noticeable downward slide which hardly gibes with, any concept of stabilization, except a bad one, as far as the real estate market is concerned in 1990.
 The effect all of this would have on any disposition of lots obviously would be to lengthen his estimated schedule for disposition, starting with the maximum period for obtaining approvals etc. discussed above. Furthermore, it would be the inevitable concomitant of a poor real estate market that prices or real estate, including of course "lots," would be pressured substantially downward.
 All of this points up the tremendous amount of speculation that is involved in making all of Glendinning's assumptions. The court will return to CT Page 4314 this aspect of his appraisal later in this memorandum. It also stresses the fact that as of the taking date in January, 1988, a developer purchasing raw land in bulk might well consider the many contingencies that would confront him in the future development and disposition of building lots, and in doing so, factor into his offering price, if he made one, a considerable amount of leverage in his own favor to protect himself against adverse possibilities. He certainly would be very unlikely to pay a "per lot" selling price in January, 1988, confronted with all of the unknown quantities facing him in the future.
 (3) Estimate of current (1/88) retail value for the 46 lots (Exhibit K, p. 97). Here again Glendinning recognizes that the "lots" will have individual differences which he cannot foresee, so he decides to find the "typical lot" to determine a "value estimate for each of the subject 46 lots." He then states that the appraisers have chosen Lot #30 on Redniss' proposed subdivision as the "typical lot." Presumably the plural includes the witness Kennedy, the plaintiffs' other appraiser.
 (4) Sales comparison approach. (Exhibit K, P. 98) Glendinning seeks to compare the non-existent "Lot #30" to other non-existent residential lots which he considers comparable, making his adjustments for "variables such as time, location, physical characteristics of the site, financing, conditions of sale, etc." At least three of his claimed comparables are larger than subject's "typical lot" and three are somewhat smaller.
 It is increasingly manifest as the court examines Glendinning's appraisal that it is loaded with numerous suppositions and speculations concerning the subject property. There also appears to be evidence of adjustments on some of his comparables throughout Exhibit K that are made in favor of the subject property in larger percentages than justified both on the plus and minus sides. See, for example, in this section of his appraisal (Exhibit K, P. 117) the minimal deduction from subject's valuation for the frontage on Lee's Pond or the brook running through the lot (Sales #4, #5, #6, and the scenic water view of #2.) Such partiality does not enhance the credibility of his appraisal. CT Page 4315
 Finally, Glendinning's entire theory of evaluation is perhaps summed up on p. 119 where he attempts to place a valuation on each of the 46 "lots" with what he characterizes as "adjustments." The minimal deductions for "lots" #4, 5, 3, 2, and 1 that are adjacent to or contiguous with the rear of the General Business District and the total lack of adjustments for additional lots that are found to be certainly within at least eyeshot of the rear of that district is another instance of excessive partiality toward the subject residential zone.
 Glendinning's "lot method" approach to valuation may not be used. The weight of authority on this question disapproves of such an approach. As indicated, it will be discussed in greater detail later in this memorandum.
Glendinning next proceeds to "explain estimated projected expenses." Here again the court is confronted with nothing but estimates based upon a proposed non-existent subdivision created solely for the purpose of going to trial and never officially submitted for approval of the town and state agencies who must grant their consents. Engineering is "estimated" at $200,000, legal fees at $100,000 including "subdivision process and closing costs." Considering the kind of hourly rate that attorneys have been charging, this estimate, like the others, is low. It serves no useful purpose to discuss taxes, insurance, surety bonds, interest on construction financing based on further assumption, interest on purchase mortgage, sales expense, and profit and risk, roads, accessway, sewer and water mains, broker's commissions, clearing and improving the land, taxes on unsold lots extending over 3 3/4 years minimum (based on Glendinning's estimates), but likely to be considerably longer in the court's judgment. The reason such discussion would not be useful is simply that it is based on speculation, conjecture and assumptions as of the taking date that cannot be quantified with reasonable exactitude and accuracy.
Glendinning then asserts that the Sales Comparison Approach and the Development Procedure estimates produce exactly the same values as of the taking date, $10,400,000, to the penny. (This in itself is very interesting, to say the least).
His valuation of the 1.71 acres in the GBD Zone is $4,250,000 and his valuation of the dwelling on 1.31 acres is $650,000. His total valuation before the taking is $15,300,000. His after taking valuation of damages is CT Page 4316 $14,665,000. The court cannot agree with these figures.
The court must keep in mind, with reference to all of the subject property, its history indicates that Langer bought it in 1963 and made no effort whatever to subdivide or develop it in any manner. Instead he retained it as open space. Even after his death in 1983 his estate and those named as plaintiffs in this case made no attempt whatever to subdivide or develop it. Only when the town of Westport stepped in to exercise its rights of eminent domain to retain it as open space did plaintiffs in preparation for trial of its appeal from the town's taking figure hurriedly prepare an hypothetical scenario for a subdivision of the Residence A portion. Nothing appeared in evidence to establish that there was any reasonable probability the residential zone subject property would in fact be subdivided in the reasonably near future into any number of lots, whether 47 or less. As pointed out in Budney v. Ives,156 Conn. 83, 89 dealing only with the reasonable probability of a zone change, the court states
 "No matter how probable an amendment (to zoning) may seem, an element of uncertainty remains and has its impact upon the selling price."
This same uncertainty exists with reference to the number of "lots" and other approvals necessary in the present case. The court in Budney, referring to State v. Gorga,138 A.2d 833, [138 A.2d 833], (N.J.), emphasizes that the true issue in condemnation cases is not the value of the property for the use which would be permitted if a change of zone was made, but the value of the property as zoned at the time of the taking as it is affected by the probability of a change. In the instant case there are a multitude of uncertainties present, as elucidated previously, that make the "lot method" approach to valuation improper. 4 Nichols on Eminent Domain 12.3142(1)(a), p. 12-334, speaking of the valuation of raw land, says the following:
 "It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush and boulders.
 "In some cases, however, condemnees have attempted to go so far as to show the number of lots into which a tract is divisible, estimate sales prices per lot and sales prices of comparable sales in the vicinity. In such cases, however, the courts have uniformly adopted the approach that raw land as such, with CT Page 4317 little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision. Thus the "lot method" approach to valuation may not be used. The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out street, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored, and is too uncertain and conjectural to be completed. (Emphasis added).
In Footnote #1 the court has collected a number of, but not all, the cases in various jurisdictions that embrace the rule as stated by Nichols' treatise, supra, which represents the overwhelming weight of authority on this subject.
In this same vein, Minicucci v. Commissioner of Transportation, 211 Conn. 382, 385,[2] has considerable relevance to the instant case. It quotes Nichols:
 "[C]ourts have uniformly adopted the approach that raw land, as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision. . . The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development (Emphasis added by the Supreme Court)] 4 P. Nichols, Eminent Domain (3d Ed.) 12.3142(1)(a), pp. 12-335-356.
 ". . . In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the subject property will be divided. The trial referee must make this determination not only from the testimony and physical evidence presented, but also from his or her own personal observation of the property. See General Statutes, 13a-76."
Plaintiffs claimed in Minicucci the subject land could be divided into six residential lots. The court then said at p. 386: CT Page 4318
 "Despite the fact that the plaintiffs had owned this property for fourteen years, there is no evidence that a subdivision application was ever filed or a plan prepared."
Nothing was ever done to prepare the land for single family residential development. The trial referee (House, former C.J.) concluded it was not reasonably probable that the land would in fact be subdivided in the reasonably near future.
In addition, at p. 389, plaintiffs' appraiser testified that all of the sales in his appraisal report were "lot sales." The trial referee stated this "certainly substantially diminishes the value of the evidence" but nevertheless he would admit it "for whatever weight I feel it should be given." The trial referee's decision and rulings were affirmed.
Minicucci states several very significant things that have direct application to the instant case: (1) Raw Land, as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision; (2) Despite the fact that plaintiffs had owned the subject property in Minicucci for fourteen years, there was no evidence that a subdivision application had ever been filed or a plan ever prepared; nothing was ever done to prepare the land for single family residential developments, and the trial referee, retired Chief Justice House, concluded it was not reasonably probable that the land would in fact be subdivided in the reasonably near future. (This clearly would have reference to the period of time prior to condemnation); (3) The plaintiffs appraisal report and testimony relied on "lot sales" as the basis for its opinion, which, while the trial referee admitted this evidence, he recognized that its value was "substantially" diminished and therefore he would give it "whatever weight I feel it should be given."
The instant case is governed by the law as stated in Minicucci on the method of valuing raw land.
At this juncture it is appropriate to consider briefly the appraisal of plaintiffs' other appraiser, Kennedy. Exhibit I is his appraisal report. It is based upon the Market Approach method of valuation and as to the major portion of the taking involving the land in the Residential Zone, he says he compares unimproved residential land sales to the estimated 46 lot subdivision created on paper by plaintiffs' engineer Redniss (Exhibit D) on p. 25 of Kennedy's report and the latter's Exhibit I, p. 32. This plan was never submitted to the defendant's Planning Commission and was never approved. As with the court's commentary on Glendinning's appraisal, the CT Page 4319 court will consider for now only the section on the Residential Zone acreage. Later, the court will consider briefly Kennedy's appraisal of the 1.30 acres with the homestead dwelling on the residential portion that has not been taken by defendant, at the same time it examines Glendinning's appraisal, of that portion, and the court will then consider the 1.71 acres of commercial land as appraised by both of plaintiffs' appraisers.
Kennedy's appraisal suffers from the same weaknesses as Glendinning's. All of his values are based on a per lot value of 46 lots in a subdivision that was not in existence on the taking date. All 46 lots are valued at $250,000, for a total of $11,500,000. The court does not agree with this valuation and cannot accept the "lot method" of valuation for the reasons set forth in Nichols and Minicucci, supra, and the overwhelming weight of authority among the courts of the United States. It will serve no useful purpose to indicate the court's disagreement with some of the adjustments made because the basic and controlling fault in the appraisals of both Glendinning and Kennedy substantially deprive each of them of credibility. Each has failed to evaluate the residential property as bulk land or so-called "raw land" as a whole with consideration given to any increment and enhancement in value due to the property's present adaptability to subdivision development. See Minicucci, supra, p. 385. Neither appraiser gave any consideration to the fact that plaintiff Langer owned this property since the early 1960's and neither he nor his estate (since his death in 1983) made any effort whatever to undertake a subdivision of any part of the subject property. No application for a subdivision was ever filed nor any plan prepared, similar to Minicucci where plaintiffs owned their property for 14 years and never attempted to undertake any subdivision of it. See Minicucci, p. 386. In addition, at p. 389, Minicucci clearly indicates that the attempt to use "lot sales" in their appraiser's appraisal "substantially diminished" the value of such evidence.
It is also interesting to note that both of plaintiffs' appraisers appraised in 1983 the entire 32 acres (including the dwelling and the commercial zone property) for $3.8 million dollars (Kennedy) and 4.3 million dollars (Glendinning) Exhibits 5 and 6. Both sought to justify at one point their valuations as of the taking date on the basis of the booming real estate prices in the mid-1980's, Kennedy testifying to 100 per cent, in his opinion, increases in values per year over three years and Glendinning testifying to 50% increases in 1984, 1985, and 1986, compounded, leveling off to 20% per cent in 1987.[3] Elsewhere, however, in their testimony they spoke of much lower rates of increase. Exhibit K-1 Glendinning, p. 35, and Kennedy, Exhibit I, p. 51, 47, 54. CT Page 4320
Finally, there appears in Glendinning's appraisal Exhibit K, p. 2, an attempt to dismiss out of hand the purchase price placed upon a deed from Evyan Perfumes, Inc. to Evyan Perfumes, executed February 2, 1987, and recorded October 7, 1987. The amount of the price for the transfer required an indorsement by the town clerk stating the actual amount of the tax paid. General Statutes, 12-495. The amount of the tax paid, in turn, is based upon a percentage of the true purchase price, which the party recording the instrument must disclose under penalty of law. General Statutes 12-502. The court must bear in mind that the Estate of Walter Langer is a plaintiff in the instant case and is described as "d/b/a Evyan Perfumes" and "Evyan Perfumes, Inc." is also a plaintiff in this case. Both are described as being at 350 East 35th Street, New York, New York 10016. For all practical purposes of this case, Walter Langer, his Estate, Evyan Perfumes, Inc. and Evyan Perfumes were one and same entity.
French v. Clinton, 215 Conn. 197, 204, states: ". . . [T]he amount indicated by the stamp (of the town clerk) provides persuasive evidence of the true purchase price" in the absence of some compelling evidence that the tax stamp was based upon a falsified statement of the actual consideration. No evidence of falsification appeared in this case. The trial court in French was affirmed in holding that the price paid for the property in question, as evidenced by the tax stamp, was more reliable and worthy of belief than other hearsay evidence in the case.
In the present case, the tax stamp affixed on October 7, 1987, indicated the valuation of all of Langer's property at $5,200,000 as of approximately three months before the taking date, all of which contributes to the court's conclusion that both Glendinning and Kennedy are extremely wide of the mark in their very high appraisal valuations on the date of taking. Since the plaintiffs have the burden of proof to establish the accuracy of their appraisers' valuations, and since the latter are in the court's judgment substantially discredited for reasons elucidated previously, the court cannot accept them as reasonably accurate appraisals of the taking in this case.
There remains to be considered the commercially zoned land on East State Street for 329 feet to a depth of approximately 200 feet, 1.71 acres +/- in all, and Parcel B in Residence A zone constituting 2.515 acres +/- remaining after the taking of the area of raw land in Residence A zone with a sizable pond in front of a dwelling. For the dwelling on 1.3 acres +/- of land with a probable subdivision for one additional lot approximately one acre in size, Glendinning reaches a total CT Page 4321 value for both the dwelling and the one acre lot of $635,000 of which $145,845 is ascribed to the one acre lot. These figures include his "adjustments." (The total value of the potential lot (p. 131) he fixes at $350,000 but deducts over 58% for lack of subdivision approvals, proximity to pedestrian accessway to park, and "long accessway.")
Kennedy values the two story residence on 1.3 acres at $700,000. (Exhibit I, p. 39) Then he says the value of the remaining Parcel B (Exhibit I p. 74) on "2.515 acres with a potential additional lot is $700,000, so that the before and after taking value of Parcel B remains the same with no severance damage. This is somewhat strange because no consideration is given to the difference in acreage. It is not, however, important as the court sees it.
Kennedy values the 1.71 acres of vacant commercial land (p. 73) at $4,100,000 and the 46 potential lots in a subdivision of 28.83 acres of Residence A zone land at $11,500,000, for a total damage after taking of $15,600,000 (p. 74).
Showah, one of the defendant's experts, valued the commercial portion of the subject property at $3,000,000. Plaintiffs appraisers failed to grant sufficient importance to the principle that smaller parcels of land tend to sell for higher rates, which leaves the court to believe that some of the comparables (at 90 Main Street and 468 Post Road East) lack true comparison. The court believes plaintiffs over valued the commercial portion of the land. In addition, plaintiffs' appraisers have failed to acknowledge any impact on value based upon zoning requirements of the town making it necessary for an owner, on commercial property of the size involved here, to construct two buildings with the larger not exceeding 10,000 square feet. Such constraints upon a buyer would certainly diminish the property's value in his judgment.
Carvell, defendant's other appraiser, is the defendant's assessor but is also qualified as a licensed appraiser of commercial and residential properties. He appraised the commercial portion at $3,129,000, and took into account a 5% negative adjustment on value caused by the stock market crash of October 1987.
 IV
The court viewed the subject premises in the company of counsel for both sides. Some of the claimed comparables were also viewed.
The defendant's appraiser Showah submitted his report CT Page 4322 which, compared to the sheer paper bulk of Glendinning's report (133 pages plus addenda of approximately 17 additional pages) was overwhelmingly dwarfed in size and weight. Kennedy managed to produce 75 pages plus addenda of approximately 9 additional pages.
Showah's valuation of the total subject property as of June 1, 1987, was $9,250,000 revised on December 28, 1987, to $8,373,000. Of the latter figure, he assigned $3,000,000 to the commercial land and $5,373,000 to the raw residential land. Showah, like Glendinning and Kennedy, commits the same error of using a "lot method" approach to the valuation of the taken residential raw land as though the subdivision of the land into lots was an accomplished fact on the date of taking. The court has already discussed this matter above in this memorandum.
Carvel appraised the commercial portion at $3,129,000 and the residential portion at $5,880,000. Like the other appraisers, he sought a price based on the "lot method" approach as though a subdivision was actually in existence on the date of taking. Such a result can only lead to speculation and conjecture. 4 Nichols on Eminent Domain 12.3142(1)(a), p. 12-334. As Minicucci, supra, points out, courts have uniformly adopted the approach that raw land, as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision. The accepted rule for the evaluation of such land, therefore, is to consider the land in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development.
The speculation and conjecture that results from valuing raw land as if in fact it was a subdivision can inevitably lead to inflated valuations created easily by mathematical formulae that do not measure the realities of the problems presented to a developer buying raw land as a whole by attempting to prognosticate costs and lot prices four and five years or more in advance. This speculation and conjecture is the weakness underlying both of plaintiffs' appraisals that make it impossible for the court to accept their valuations of damages. The burden of proof on damages is clearly the plaintiffs' and not the defendant's in this case and it has not been met. The same deficiency on the part of defendant's appraisers does not carry the same effect as plaintiffs' because the defendant has no burden of proof to establish damages over and above the taking figure. In fact, the utilization of the "lot method" of valuation by defendant's appraisers in the instant case may well have resulted favorably to plaintiffs by producing higher valuations on the raw land than the proper approach for such CT Page 4323 land valuation would have produced as approved in Minicucci, supra, and the overwhelming weight of authority.
The valuation of the portion of the remaining residential property known as Parcel B containing the homestead and 2.515 acres of land does not carry a significant impact in this case, except that the basis of the opinions offered by plaintiffs' appraisers, in the court's judgment, casts additional shadows on the credibility of their reasons for their other evaluations. Carvel, defendant's appraiser, valued the homestead, both before and after the taking of the Parcel A Portion, at $700,000. While the homestead prior to the taking had 1.5 acres of land compared to 2.515 acres of land after the taking, that could reasonably be viewed as increasing its value, the court is satisfied to find a value of $700,000 for the homestead both before and after the taking.
 VI
The court's function in eminent domain cases such as this has frequently been commented upon by the Supreme Court. The following quotation from Daddario v. Commissioner of Transportation, 180 Conn. 355, 365-366, sums it up:
 "In determining fair market value, the trial court is free to select the method of valuation most appropriate to the case before it. . . When, as here, the trier has visited the property to be appraised, he may rely on his visual observations to supplement the evidence presented for his consideration by the witnesses under oath. . . In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises. . . ."
In accordance with this rule, this court finds the following valuations for the subject property:
The value of entire parcel before the taking:
(1) Parcel A (1.71 acres) +/- $ 3,000,000
(2) Homestead (1.5 acres) +/- 700,000
(3) Residence A zone, portion CT Page 4324 (29.495 acres) +/- 6,425,000 ___________ $10,125,000
 After the taking, the value of the homestead and adjacent 2.5 acres not taken — 700,000 ___________ Damages resulting from the taking $ 9,425,000
As for the payment of appraisal fees, the court must keep in mind that both of plaintiffs' appraisers had previously appraised the subject property in 1983. It is reasonable to infer that a considerable amount of their work in the present case had been done in connection with their earlier appraisals. Neither Glendinning nor Kennedy offered any clarification of how much of their appraisal work had been done in 1983. The court thinks an award for Glendinning's appraisal fees of $6,000 would be reasonable, and so finds it. For Kennedy's fees, the sum of $6,000 is allowed.
Section 48-26 allows, in addition to reasonable appraisal fees, reasonable fees for expert testimony incurred by the owner. The sums requested by plaintiffs are exorbitant. The court will allow $750 for Glendinning's testimony (3 days) and $1,000 for Kennedy's (4 days).
Under the same statute, however, it does not appear that engineering fees are allowed as requested in plaintiffs' main brief (p. 41). See Sorenson Transportation Co. v. State,3 Conn. App. 329, 333, cert. denied 196 Conn. 801. Therefore, no allowance is made for such fees. See also 48-6, 48-12, and8-133.
The court, therefore finds the plaintiffs sustained damages of $9,425,000 and is entitled to a payment of $1,050,000 over and above the $8,375,000 the plaintiffs have received heretofore, and to an additional $12,000 for appraisal fees plus $1,750 for expert witnesses' fees. Statutory interest shall run on $1,050,000 only from the date of taking to the date of payment. Judgment for plaintiffs may enter accordingly.
GEORGE A. SADEN, S.T.R. MILTON H. BELINKIE, S.T.R. MILTON J. HERMAN, S.T.R.